FILED
Feb 25 2022
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY  s/ charlest  DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

August 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SATISH KURJIBHAI KUMBHANI,<br>  aka "Vindee,"<br>  aka "VND,"<br>  aka "vndbcc,"<br><br>Defendant. | Case No. '22 CR395 TWR<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 1349 - Conspiracy to Commit Wire Fraud; Title 18, U.S.C., Sec. 1343 - Wire Fraud; Title 18, U.S.C., Sec. 371 - Criminal Conspiracy; Title 18, U.S.C., Sec. 1960 - Operation of an Unlicensed Money Transmitting Business; Title 18, U.S.C., Sec. 2 - Aiding and Abetting; Title 18, U.S.C., Sec. 1956(h) - Conspiracy to Commit Money Laundering; Title 18, U.S.C., Sec. 982(a), and Title 28, U.S.C., Sec. 2461(c) - Criminal Forfeiture |

At all times relevant, the Grand Jury charges:

**INTRODUCTORY ALLEGATIONS**
**Relevant Individuals, Entities, Federal Agencies, and Terms**

1.  BitConnect International PLC, aka "BitConnect," aka "BitConnect Ltd.," (referenced herein as "BitConnect") was an unincorporated organization established in approximately 2016. Between 2016 and 2017, BitConnect formed several affiliated entities in the United Kingdom, including but not limited to: BitConnect Ltd. and BitConnect International PLC, which were all part of BitConnect.

2.  BitConnect operated a cryptocurrency investment platform and touted its various investment programs through social media. BitConnect conducted its business principally by means of websites accessible at www.bitconnect.co and

DCS:nlv:San Diego:2/25/22

www.bitconnectcoin.co (together referenced as the "BitConnect Website"). The BitConnect Website was accessible worldwide to the general public and was accessed by individuals within the Southern District of California and elsewhere.

3. Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI"), was a citizen of India who resided in Surat, India. Defendant KUMBHANI founded, managed, and controlled BitConnect. Defendant KUMBHANI used fictitious identities, including "Vindee," "VND," and "vndbcc" in order to conceal his identity and his control over BitConnect.

4. Defendant KUMBHANI directed BitConnect's international network of affiliates, promoters, directors, managers, employees, and agents. Defendant KUMBHANI disseminated information via wire communications in the United States and globally to the general public and to BitConnect's network of promoters and affiliates, all for further dissemination to the investing public regarding BitConnect's various investment programs. Defendant KUMBHANI caused thousands of investors worldwide to invest in BitConnect's cryptocurrency investment programs.

5. Glenn Arcaro ("Arcaro", charged elsewhere) was a resident of the United States and served as BitConnect's "national promoter" for the United States from in or around August 2017 to 2018 and was responsible for managing a team of United States-based promoters for BitConnect. Arcaro served as one of the most prolific and successful promoters of BitConnect.

6. Defendant KUMBHANI supervised, directed, and managed Arcaro as BitConnect's national promoter in the United States, and communicated regularly with Arcaro via wire communications.

7. Future Money, Ltd. ("Future Money") was a limited company established in approximately 2017 in Hong Kong. Arcaro formed Future Money with the approval of Defendant KUMBHANI as a way to lure people to invest in BitConnect. Arcaro publicly represented that Future Money was a cryptocurrency education course but, in fact, it was a sales funnel for BitConnect.

8. The Financial Crimes Enforcement Network ("FinCEN") was an agency of the United States Department of the Treasury. FinCEN was responsible for regulating financial institutions in connection with compliance with the Bank Secrecy Act and the regulations thereunder.

9. A "Digital asset" or "digital token" generally referred to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets referred to as "cryptocurrencies," "virtual currencies," "digital coins," and "digital tokens."

10. The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions.

11. "Bitcoin" was a type of cryptocurrency. Bitcoin were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin could be used for purchases or exchanged for other currency on currency exchanges. Bitcoin was commonly known as "BTC."

12. A "trading bot" was computer software programmed to trade a digital asset based upon predetermined parameters.

13. A "cryptocurrency wallet" was a digital wallet used to store, send, and receive digital currency like Bitcoin. Each digital wallet had a unique digital address containing letters and numbers that were used in order to send and receive cryptocurrency transactions.

14. A "cluster" referred to a collection of related cryptocurrency wallets or addresses usually under the control of a single entity or affiliated individuals.

15. An initial coin offering ("ICO") was a capital raising event in which an entity offered investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies or fiat currency. These tokens were issued on a blockchain and were oftentimes listed on online platforms, called virtual currency exchanges, where they were tradable for virtual or fiat currencies.

16. To participate in an ICO, investors were typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During an ICO, or after its completion, the issuer would typically distribute its unique "tokens" to the participants'

3

unique address on the related virtual currency's blockchain. Similar to stockholders in an initial public offering ("IPO"), holders of these tokens were then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and voting rights.

17. Under Title 7, United States Code, Section 1a(9), a "commodity" encompassed a wide range of tangible and intangible items and was broadly defined to include all goods, articles, rights, and interests in which contracts for future delivery were presently or in the future dealt. Cryptocurrencies were commodities because there could be a contract for future delivery of a specific cryptocurrency.

18. A money transmitting business (also referenced herein as an "MTB") included any person doing business whether on a regular basis or as an organized business concern, including businesses operating a digital currency exchange in which such businesses exchanged one virtual currency into another virtual currency. An MTB was a financial institution and required to register as such with FinCEN under Title 31, United States Code, Section 5330 and the regulations thereunder. The failure to register an MTB with FinCEN was a federal felony offense.

**Relevant Factual Background regarding Defendant and BitConnect**

The Formation and Management of BitConnect

19. In or around 2016, Defendant KUMBHANI created BitConnect. To do so, Defendant KUMBHANI and others caused the creation of a native digital token or digital currency called the "BitConnect Coin" ("BCC"), which was based on BitConnect's own blockchain. At BCC's peak price, BitConnect's market capitalization was approximately $4.3 billion. The BitConnect Website was accessible to the public globally, including to individuals located within the Southern District of California, and provided potential investors with information about BitConnect's investment programs and an account login link.

//
//

4

20. From in or around November 2016 to in or around January 2017, Defendant KUMBHANI and others conducted an ICO of BCC and introduced BCC to the investing public through the BitConnect Website and other wire communications. BitConnect claimed that BCC was an open-source, decentralized cryptocurrency.

21. Defendant KUMBHANI recruited promoters and affiliates, including Arcaro, from Asia, Europe, North America, Australia, and elsewhere to promote BCC and the investment programs BitConnect was offering. Defendant KUMBHANI organized various events internationally to promote BitConnect's blockchain technology, investment opportunities, and investment returns to the promoters and affiliates.

22. During one such presentation in or around August 2017 to BitConnect's promoters, including Arcaro, Defendant KUMBHANI made various statements in response to questions, including the following:

    a. When asked about the ownership of BitConnect, Defendant KUMBHANI stated that if the "government" knew the identity of BitConnect's owner, the government "might punish them . . . so we . . . ultimately lose our money."

    b. When asked why one of the United Kingdom corporate registration documents for BitConnect listed "Ken Fitzsimmons," a nominee, as a corporate officer for BitConnect, Defendant KUMBHANI explained that "Fitzsimmons" was listed because of Defendant KUMBHANI's desire to remain anonymous.

    c. When asked about tax compliance, Defendant KUMBHANI stated, "we [BitConnect] don't have any regulations . . . we are dealing only with cryptocurrency, so we are not paying any tax to the government."

    d. When asked how many coins BitConnect issued during the 2016 ICO, Defendant KUMBHANI stated that BitConnect issued "4.8 million BCC tokens at the time of [the 2016] ICO."

//
//
//

e. When asked how BitConnect made money, Defendant KUMBHANI stated, "I already explained you [sic]. How BitConnect is making money they are using the Volatility Software . . . they are getting the profit from there and they also already have one million BCC token [sic] so if they want to make profit, they sell it . . . you understand?"

f. When asked about the long-term prospects and viability of BitConnect, Defendant KUMBHANI stated, "This will not . . . shutdown by night."

BitConnect's Lending Program Was a Ponzi Scheme

23. Defendant KUMBHANI, Arcaro, and others aggressively marketed BitConnect's "Lending Program."

24. Defendant KUMBHANI and others touted the Lending Program's purported "Trading Bot" and "Volatility Software" as the centerpiece of BitConnect's Lending Program, while knowing that the marketing materials for the Lending Program contained multiple false and fraudulent statements. Defendant KUMBHANI and others represented that BitConnect would use investors' money as working capital to fund its own investment activity. Specifically, Defendant KUMBHANI, through BitConnect, falsely and fraudulently claimed that BitConnect's proprietary "Trading Bot" and "Volatility Software" would generate substantial profits for investors by trading on the volatility of global cryptocurrency markets.

25. In truth, Defendant Kumbhani ran the Lending Program as a massive Ponzi scheme. BitConnect did not use assets invested in the Lending Program for trading related to the purported Trading Bot and Volatility Software, and did not use purported profits to distribute proceeds to Lending Program investors, but rather paid earlier investors in the Lending Program with money from later investors.

26. By inducing investors to invest money through misrepresentations about BitConnect and the Lending Program, Defendant KUMBHANI caused BitConnect to obtain approximately $2.4 billion from retail investors worldwide, including investors in the Southern District of California.

//

6

27. In 2017, during an interview at an event organized by Defendant KUMBHANI, Defendant KUMBHANI was asked about the purported "Trading Bot" and "Volatility Software." The interviewer asked Defendant KUMBHANI whether BitConnect would show the "Trading Bot" in action. In response, Defendant KUMBHANI avoided the question and evasively stated, among other things:

  a. "So you ask me very hard question . . ."

  b. "Everybody is waiting to see the Trading Bot, how it is in action . . . how we are getting the profit from the system. . . ."

  c. "[A]nd we have shown the people and shown the promoters that there are some logics [sic] working behind the Trading Bot [during a meeting with the promoters] . . . for privacy reasons we are not disclosing anything about our last meeting."

28. To obtain investments from the public, Defendant KUMBHANI and others caused BitConnect to post false and misleading information about the Lending Program's purported daily historical rates of return on the BitConnect Website, and advertised the Lending Program on Coinmarketcap.com, a popular website in the digital asset space that tracked price, available supply, trade volume, and market capitalization of various digital tokens. These websites were accessed globally, including by individuals located within the Southern District of California.

### BitConnect's Exchange was an Unregistered Money Transmitting Business

29. To participate in the Lending Program, a prospective investor was first required to create an account on the BitConnect Website, and then transfer Bitcoin to a Bitcoin blockchain address provided to the investor and controlled by Defendant KUMBHANI and BitConnect. BitConnect then pooled the investors' Bitcoin in a series of addresses, or digital wallets, on the Bitcoin blockchain, which Defendant KUMBHANI controlled.

30. The investor's account page on the BitConnect Website would then reflect the investor's purported Bitcoin investment in the investor's Bitcoin wallet.

//

7

31. The investor would then remit Bitcoin to BitConnect to purportedly purchase BCC tokens on the "BitConnect Exchange"—a digital currency exchange and money transmitting service engaged in the business of the transmission of funds and digital currency—and then "lend" the BCC tokens to BitConnect, which, in turn, would purportedly invest these proceeds by buying and selling automatically, and profitably, on the volatility of Bitcoin via the Trading Bot.

32. BitConnect charged Lending Program investors an exchange fee through the BitConnect Exchange each time they exchanged their Bitcoin for BCC or exchanged BCC back into Bitcoin.

33. Although Defendant KUMBHANI, through BitConnect, operated the BitConnect Exchange as an MTB in the United States, including within the Southern District of California, neither Defendant KUMBHANI, nor any other person, ever registered BitConnect or the BitConnect Exchange with FinCEN, or complied with the statutes and regulations governing an MTB under Title 31, United States Code, Section 5330 and the regulations thereunder.

BitConnect's Referral Program

34. Defendant KUMBHANI and BitConnect also operated a Pyramid Scheme known as the "Referral Program" through which BitConnect relied on promoters, like Arcaro, to promote and direct investors to invest in BitConnect's Lending Program.

35. At Defendant KUMBHANI's direction, Arcaro and other global promoters used unique Internet hyperlinks known as "referral links" to offer the Lending Program on their personal social media pages. Investors, in turn, used the referral links to access the BitConnect Website, sell their Bitcoin in exchange for BCC, and invest in BitConnect's Lending Program. Defendant KUMBHANI paid commissions to BitConnect's promoters when investors invested in the Lending Program through the referral links.

36. Under the Referral Program, at the direction of Defendant KUMBHANI, Arcaro and other global promoters posted videos to their social media pages that contained materially false and misleading statements about the profits that they could earn from

investing in the Lending Program. These videos were broadcast over the Internet and were viewed by individuals throughout the world, including in the Southern District of California.

37. Defendant KUMBHANI, Arcaro, and others used live events to attempt to persuade individuals to invest in BitConnect's investment programs, including by investing their retirement and life savings. During one such event, BitConnect awarded Arcaro a Porsche for successfully luring investors to invest in BitConnect through the Lending Program and otherwise purchasing BCC.

38. On or about October 13, 2017, in a group text message, Arcaro wrote to a group of BitConnect's promoters and described how effective live events were in soliciting investments into BitConnect, stating that, "When people get to events and they actually see human flesh that only existed on a computer screen, something clicks in your head and it becomes real only at that moment. People just want to be part of something bigger than themselves. They're bored they're [sic] lives generally suck. If they feel like they belong somewhere, all the guards come down, that's when they start investing for real."

39. The Referral Program was essentially a Pyramid Scheme that rewarded BitConnect's promoters who successfully recruited investors. In fact, in its marketing materials, BitConnect depicted the Referral Program as a multi-level pyramid.

BitConnect's Development Fund

40. To reward promoters for successfully recruiting investors, Defendant KUMBHANI paid promoters like Arcaro and others additional income from a pool of investment proceeds known as the "Development Fund," which was essentially a slush fund of investors' money. Promoters could use these funds to market BitConnect's investment programs. National promoters for BitConnect, like Arcaro, could also use Development Fund payments for their own personal use.

41. Defendant KUMBHANI directed others, including Arcaro and other promoters for BitConnect, to conceal and hide the existence of the Development Fund from the public. Defendant KUMBHANI did not want the public to know how investors' money was being diverted and spent.

9

42. On or about August 25, 2017, Defendant KUMBHANI admonished Arcaro in writing for revealing the Development Fund to the public through videos posted to his social media pages. Specifically, Defendant KUMBHANI stated the following:

    a. "You are wrongly promoting [the] development fund in public and YouTube."

    b. "Immediately stop promoting and delete all."

    c. "Requesting you to remove all related posts."

    d. "Stop all activities immediately."

In response, Arcaro wrote to Defendant KUMBHANI, "It will not happen again" and "You have my word."

43. Given the directives from Defendant KUMBHANI regarding the Development Fund, in a text message exchange on or about November 28, 2017, Arcaro directed other promoters based in the United States, who were beneath Arcaro in the Referral Program pyramid (also referred to as Arcaro's "downline"), to conceal and mislead investors about the Development Fund. Arcaro wrote: "BitConnect honchos say don't talk about the development fund on video. Big no no in their eyes. You're supposed to phrase it all as if it's coming from you. Just don't mention that they [BitConnect] are funding." By "BitConnect honchos," Arcaro was primarily referring to Defendant KUMBHANI.

44. Similarly, in a text message exchange on November 28, 2017, Arcaro directed his downline promoters: "Don't ever show your dev fund on camera. If you have videos showing that fund, gotta take it down."

45. The concealment of the Development Fund by Defendant KUMBHANI, Arcaro, and other promoters was designed to hide from investors that up to 15% of their investment in BitConnect's investment programs was being diverted directly into the Development ('slush') Fund and not invested as promised by BitConnect.

<u>BitConnect's Relationship with Future Money</u>

46. In 2017, with the support and encouragement of Defendant KUMBHANI, Arcaro created "Future Money," which was a purported educational program for individuals

10

interested in investing in cryptocurrency. Future Money was funded with money obtained from BitConnect's investors.

47. Defendant KUMBHANI and Arcaro agreed to use Future Money as a sales funnel for BitConnect, which was intended to benefit Defendant KUMBHANI by identifying a larger number of potential investors for BitConnect.

48. Arcaro hid and concealed any financial relationship between Future Money and BitConnect from the public on the Future Money website and in any statements Arcaro made on social media.

49. Upon completion of the Future Money cryptocurrency course, however, Future Money directed its graduates to open accounts with BitConnect and use BitConnect's promoter network's referral links.

## BitConnect Shuts Down

50. As Defendant KUMBHANI's Ponzi scheme grew in size and scope, government regulators began to question the fraudulent nature and appearance of the scheme and took steps to shut down BitConnect's operation in specific states.

51. For example, on or about January 4, 2018, the Texas State Securities Board issued an Emergency Cease and Desist Order against BitConnect, in which the Securities Commissioner of the State of Texas concluded that BitConnect had engaged in fraud, made materially false and misleading statements to investors in Texas, and sold unlicensed securities.

52. Similarly, on or about January 9, 2018, the Secretary of State of North Carolina - Securities Division issued a Temporary Cease and Desist Order against BitConnect to prevent BitConnect from further violating state securities laws because the State had concluded that BitConnect's investment offerings were unregistered securities.

53. Facing increasing regulatory scrutiny, on or about January 16, 2018, BitConnect abruptly announced it was shutting down the Lending Program immediately. From its peak price in early January 2018 to the closing price in the aftermath of Defendant BitConnect's shutdown, the price of BCC plunged approximately 98% in value.

54. Shortly thereafter, in order to fraudulently manipulate and prop up the price of BCC, Defendant KUMBHANI directed BitConnect's network of international promoters to buy BCC on all cryptocurrency exchanges in order to create the false appearance of legitimate market demand for BCC.

55. The very next day, on or about January 17, 2018, in a group text message involving BitConnect's network of international promoters, a promoter for BitConnect based in South Korea warned Defendant KUMBHANI that, "Koreans are freaking out" and that "it was really bad [in Korea]." Another promoter for BitConnect based in South Korea further warned Defendant KUMBHANI that, "some people here are talking about committing suicide over here in Korea in many BCC chat rooms. Please please post something on bcc website so people know what's really going on" and "lots of [Korean investors] invested everything they have."

56. That same day, on or about January 17, 2018, a promoter for BitConnect based in Indonesia alerted Defendant KUMBHANI in a group text message that, "In Indonesia we have a problem with some member[s] want[ing] to bring us to the police, [especially] … as a top promoter." In response, Defendant KUMBHANI wrote, "I will talk to you in private."

57. On or about January 21, 2018, in a group text message involving Defendant KUMBHANI and BitConnect's network of international promoters, a promoter based in Australia wrote that, "we are getting death threats . . . [and] the coin will be useless!!!!!"

58. After repeated warnings from BitConnect's promoters, on or about January 28, 2018, Defendant KUMBHANI responded in a group text message and stated that he was not "relaxing" and that he had been "sick" for "three days," and that he had "more problems" than "you guys."

59. At this time, global investors in BitConnect and the Lending Program were unable to withdraw their investments after BitConnect shut down its Lending program and BCC investments became essentially worthless. Investors in BitConnect who did not cash out before the shutdown lost all or nearly all of their investments.

60. In contrast, Defendant KUMBHANI and his co-conspirators obtained approximately $2.4 billion from investors worldwide through their global fraud scheme. Defendant KUMBHANI and his conspirators further concealed the location, source, origin, ownership, and control of the investment proceeds fraudulently obtained from BitConnect's investors based in the United States and elsewhere by commingling, cycling, and exchanging such funds through BitConnect's cluster of cryptocurrency wallets and various internationally-based cryptocurrency exchanges.

## COUNT 1 - Conspiracy to Commit Wire Fraud
## (18 U.S.C. § 1349)

61. The Introductory Allegations in Paragraphs 1 through 60 of this Indictment are hereby re-alleged and incorporated herein.

62. Between approximately 2016 and 2018, in the Southern District of California and elsewhere, Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI"), together with others, known and unknown to the Grand Jury, including Arcaro, knowingly and intentionally combined, conspired, and agreed to commit an offense against the United States, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, to wit: Defendant KUMBHANI and others agreed to execute and attempt to execute a scheme and artifice to defraud investors and potential investors in BitConnect, a cryptocurrency investment platform, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through the use of interstate and foreign wire communications.

63. It was a purpose of the conspiracy for Defendant KUMBHANI and his co-conspirators, including Arcaro, to: (a) induce investors to invest in BitConnect through materially false and fraudulent pretenses, representations, and promises; (b) generate profits for themselves and for BitConnect; and (c) conceal the conspiracy.

//
//
//

13

## Manner and Means of the Conspiracy

64. It was a part of the conspiracy that:

   a. Defendant KUMBHANI and his co-conspirators, using interstate and foreign wire communications, discussed the scheme to defraud over Internet chats and text messages, posted videos to social media platforms to encourage investment in BitConnect, and used the BitConnect Website to promote the scheme.

   b. Defendant KUMBHANI and his co-conspirators made and caused others to make materially false and fraudulent pretenses, representations, and promises to, and concealed and caused others to conceal material facts from, investors and potential investors, regarding BitConnect's Lending Program, Referral Program, Development Fund, and purported Trading Bot and Volatility Software.

   c. Defendant KUMBHANI and his co-conspirators operated a Ponzi scheme by paying earlier investors with money from later investors in order to perpetuate the fraudulent scheme.

   d. Defendant KUMBHANI and his co-conspirators evaded and circumvented U.S. regulations governing the financial industry in order to perpetuate and conceal the fraudulent scheme.

65. In total, Defendant KUMBHANI and his co-conspirators fraudulently induced investors to invest approximately $2.4 billion in BitConnect and to deposit those funds in BitConnect's cluster of cryptocurrency wallets.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2 - Wire Fraud
## (18 U.S.C. § 1343)

66. The Introductory Allegations in Paragraphs 1 through 60 of this Indictment are hereby re-alleged and incorporated herein.

67. Between approximately 2016 and 2018, in the Southern District of California and elsewhere, Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI"), together and with others, known and unknown

14

to the Grand Jury, including Arcaro, did knowingly and intentionally devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds.

All in violation of Title 18, United States Code, Section 1343.

## COUNT 3 - Conspiracy to Commit Commodity Price Manipulation
## (18 U.S.C. § 371)

68. The Introductory Allegations in Paragraphs 1 through 60 of this Indictment are hereby re-alleged and incorporated herein.

69. Between approximately 2017 and 2018, within the Southern District of California and elsewhere, Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI") knowingly and willfully did combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, including Arcaro, to commit the following offense against the United States of America: To manipulate the price of a commodity in interstate commerce, namely BCC, in violation of Title 7, United States Code, Section 13(a)(2).

### The Conspiracy

70. It was a purpose of the conspiracy for Defendant KUMBHANI, together and with others known and unknown to the Grand Jury, including Arcaro: (a) to submit buy orders to purchase BCC from cryptocurrency exchanges in order to artificially push up the price assessment of BCC; (b) to create the illusion of demand for BCC that did not reflect legitimate market-based forces of supply and demand; and (c) to conceal the conspiracy.

//
//
//

## Overt Acts

71. In furtherance of the conspiracy and to effect its objects, Defendant KUMBHANI, together with others known and unknown to the Grand Jury, including Arcaro, did commit and cause the commission of, the following overt acts, among others:

    a. Between in or around 2017 to 2018, Defendant KUMBHANI offered and sold BitConnect's cryptocurrency, or BCC, a commodity, to individuals within the Southern District of California and elsewhere.

    b. On or about January 17, 2018, a day after BitConnect shutdown its Lending Program and after BCC had lost nearly all of its value, in a group text message with BitConnect's promoters, Defendant KUMBHANI instructed, "buy [BCC] from all exchanges so BCC [price] start rising again." Defendant KUMBHANI further explained that, "if we make [BCC] price [increase] up to $100 people [will] stop panicking[,]" so "buy [BCC] slowly and make price [increase] again slowly."

    c. On that same day, on or about January 17, 2018, in a group text message with BitConnect's promoters, Defendant KUMBHANI stated, "we are pushing BCC [price] up through buying." Defendant KUMBHANI further explained that, "For now we will start buying BCC at cheap price from [the] fund[s] we receive from the BitConnect X [ICO] . . . . People will see again price is rising and BCC will change hands over time through exchanges." In response, Arcaro stated, "I've talked to my main teammates and we are all holding BCC. Nobody is selling from my main team. In fact some are placing buy orders right now . . . ."

    d. On or about January 18, 2018, Arcaro stated in a group text message with Defendant KUMBHANI and others, "I think we can bring back BCC to where it belongs." That same day, Defendant KUMBHANI stated in a group text message, "In 1 week we will make it $100 again" and that "BCC [was] the top gainer today." Arcaro agreed, replying that the price of BCC was "rising from the ashes."

All in violation of Title 18, United States Code, Section 371.

//

## COUNT 4 - Operation of an Unlicensed Money Transmitting Business
## (18 U.S.C. §§ 1960, 2)

72. The Introductory Allegations in Paragraphs 1 through 60 of this Indictment are hereby re-alleged and incorporated herein.

73. Between approximately 2017 and 2018, within the Southern District of California and elsewhere, Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI"), together with others, known and unknown to the Grand Jury, knowingly conducted, controlled, managed, supervised, directed, and owned all or part of a money transmitting business, which affected interstate or foreign commerce, and failed to comply with the money transmitting registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

All in violation of Title 18, United States Code, Sections 1960 and 2.

## COUNT FIVE - Money Laundering Conspiracy
## (18 U.S.C. § 1956(h))

74. The Introductory Allegations in Paragraphs 1 through 60 of this Indictment are hereby re-alleged and incorporated herein.

75. Between approximately 2017 and 2018, within the Southern District of California and elsewhere, Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI"), together with others, known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, and agreed among themselves to commit the following money laundering offense: to transport, transmit, and transfer, and attempt to transmit and transfer, monetary instruments and funds, from a place in the United States to and through a place outside of the United States, knowing that the monetary instruments and funds involved in such actual and attempted transportation, transmission, and transfer were designed in whole or part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of one or more

//

specified unlawful activities, to wit: wire fraud in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i). All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

### (18 U.S.C. § 982)

76. The allegations set forth in Counts 1, 2, 4, and 5 are realleged herein for purposes of seeking forfeiture to the United States of America pursuant to Title 18, United States Code, Section 982(a), and Title 28, United States Code, Section 2461(c).

77. Upon conviction of the offense alleged in Count 1 or 2 of this Indictment, Defendant SATISH KURJIBHAI KUMBHANI, aka "Vindee," aka "VND," aka "vndbcc," ("Defendant KUMBHANI") shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(8)(B) and Title 28, United States Code, Section 2461(c), any real or personal property used or intended to be used to commit, to facilitate, or to promote the commission of Count 1 or 2 and constituting, derived from, or traceable to the gross proceeds obtained directly or indirectly as a result of the commission of Count 1 or 2, including but not limited to $2,400,000,000.00.

78. Upon conviction of the offenses alleged in Count 4 or 5 of this Indictment, Defendant KUMBHANI shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), any property, real or personal, involved in Count 4 or 5, or any property traceable to such property, including but not limited to $2,400,000,000.00.

79. In the event that any of the property described above, as a result of any act or omission of defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

//

1           e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeit substitute property up to the value of the afore-described properties pursuant to Title 18, United States Code, Section 982(a), and Title 28, United States Code, Section 2461(c).

DATED: February 25, 2022.

RANDY S. GROSSMAN
United States Attorney

By: _____
DANIEL C. SILVA
MARK W. PLETCHER
LISA J. SANNITI
CARL F. BROOKER, IV
Assistant U.S. Attorneys

JOSEPH S. BEEMSTERBOER
Acting Chief
U.S. Department of Justice
Fraud Section

By: _____
KEVIN LOWELL
Trial Attorney